UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
GLADYS EJIOGU,                         :
                                       :
                          Plaintiff,   :        15cv505 (DLC)
                                       :
             -v-                       :        OPINION AND ORDER
                                       :
GRAND MANOR NURSING AND                :
REHABILITATION CENTER,                 :
CAROLYN MOOYOUNG, and HOWARD WOLF,     :
                                       :
                          Defendants.  :
                                       :
---------------------------------------X

APPEARANCES:

For the Plaintiff:
Gregory Antollino
275 Seventh Avenue, Suite 705
New York, New York 10001

For Defendant Grand Manor Nursing and Rehabilitation Center:
Joseph J. Lynett
Jackson Lewis P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601

For Defendants Carolyn Mooyoung and Howard Wolf:
Elior D. Shiloh
Lewis, Brisbois, Bisgaard & Smith, LLP
77 Water Street, Suite 2100
New York, New York 10005

DENISE COTE, District Judge:

    Gladys Ejiogu ("Ejiogu") has sued her former employer Grand

Manor Nursing and Rehabilitation Center ("Grand Manor") and two

of its supervisors under the Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 et seq., § 504 of the Rehabilitation

Act, 29 U.S.C. § 794, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.  The defendants have moved for summary judgment under Rule 56, Fed. R. Civ. P.  For the reasons that follow, the defendants' motion is largely granted.

## BACKGROUND

The following facts are undisputed or taken in the light most favorable to Ejiogu, unless otherwise noted.  Grand Manor is a nursing and rehabilitation center.  Ejiogu was employed by Grand Manor as an In-Service Coordinator for almost two years, beginning November 1, 2011.  Her responsibilities included training all staff members on resident care and conducting the orientation of new employees.  Ejiogu was also required to visit the unit floors, make rounds to observe the quality of resident care, and assess whether additional training of staff was needed.

Howard Wolf ("Wolf"), Grand Manor's Administrator, oversaw the operations at Grand Manor during Ejiogu's employment.  Carolyn Mooyoung ("Mooyoung"), Director of Nursing at Grand Manor, served as Ejiogu's direct supervisor throughout her employment.

## I.   Ejiogu Takes Leave from June 10 to June 21, 2013.

In June of 2013, Ejiogu learned that her mother was severely ill.  Ejiogu asked Mooyoung for time off to visit and care for her mother in Nigeria.[1]  Ejiogu has described Mooyoung's response as follows:

> [Mooyoung] said to me, Gladys I am not going to let you go for three months; unless you are going to go for two weeks and come back. . . . So the first time I got the news that my mom was sick I went to her.  She told me you can't go.  But then administrator said, Oh, Gladys can go because why can't she go; we allow other staff members; if her mother is sick, why can't she go; allow her to go.  But then Carolyn Mooyoung objected and I said, Okay, no problem; I am just going to go for two weeks and I will be back.

Ejiogu took approximately two weeks of leave from June 10 to June 21.  Her mother died on June 18.  Ejiogu's period of leave consisted of three personal leave days, one sick leave day, and one week of bereavement leave.  Ejiogu was paid for all but one day of this leave.

## II.  Ejiogu Receives FMLA Leave from June 25 to September 25, 2013.

Ejiogu did not return to work as scheduled.  On June 26, Ejiogu's doctor sent a letter to Grand Manor asking to excuse

---

[1] Mooyoung recalls having a conversation with Ejiogu concerning her mother's illness, but claims to have "told [Ejiogu] she needed to speak to Howard Wolf."  Wolf cannot recall a time when Ejiogu asked for family medical leave to visit her ailing mother in Nigeria.

Ejiogu from June 26 to August 26 since she was "receiving medical care that requires frequent medical tests and follow up visits . . . [and] is unable to work in her current condition." According to Ejiogu, the stress associated with her mother's death had exacerbated her preexisting Graves' disease symptoms.

That same day, Grand Manor's Director of Human Resources, Jean Bosze ("Bosze"), sent Ejiogu a letter informing her that in order to be eligible for FMLA leave, her physician would need to fill out and return certain forms no later than July 5.[2]  Ejiogu submitted the required documentation in a timely fashion, and Grand Manor sent Ejiogu a formal notice of eligibility for FMLA leave on July 8.  The July 8 notice confirmed that Ejiogu's FMLA leave had commenced on June 25, and that she would be expected to return on or before September 25.  Grand Manor hired Susan

---

[2] Pursuant to the FMLA, an employer may require an employee to provide a certification from her health care provider in support of a request for leave.  See 29 U.S.C. § 2613(a) ("An employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee . . . .  The employee shall provide, in a timely manner, a copy of such certification to the employer.").  In accordance with this rule, Grand Manor's "Personnel Policies and Procedures" Handbook ("Personnel Handbook") provides: "If you are requesting leave because of your own serious health condition . . . you are required to provide medical certification from the health care provider."

Dempsey ("Dempsey") as a temporary In-Services Coordinator in Ejiogu's absence.

While Ejiogu was on FMLA leave, Grand Manor fired Bosze and her human resources ("HR") responsibilities were redistributed among Grand Manor's employees.  Thus, in addition to performing the In-Service Coordinator responsibilities, Dempsey was also required to perform HR tasks.  During her brief tenure as temporary In-Services Coordinator, Dempsey discovered that Ejiogu's office was in a state of disarray.  She communicated this information to Mooyoung, who in turn visited Ejiogu's office.  Mooyoung later described Ejiogu's office as a "mess" with "tons of misfiled, not filed, regular inservices that were never updated," and how "a lot of things that she was asked to do she didn't do."

Mooyoung does not dispute the state of her office.  Instead, she justifies the "profusion of paper" by noting that the In-Service Coordinator job was a "paper-intensive job" that required her to maintain in-service training documents.  She further explains that she had her own filing system which she understood, that no one cleaned up after her, and that she had only a small garbage can to dispose of unneeded paperwork.

### III. Ejiogu Returns to Grand Manor.

Ejiogu returned to Grand Manor on September 25 and presented Mooyoung with a signed "Return to Work" letter.  The letter was printed on Mount Sinai School of Medicine letterhead and dated September 25.  The letter stated in relevant part: "Gladys Ejiogu is cleared to return to work today, 9/25/13." Mooyoung required Ejiogu to obtain a doctor's letter indicating that Ejiogu could return to work "without restrictions."  That same day, Ejiogu acquired a new "Return to Work" letter personally addressed to Mooyoung that stated in relevant part that Ejiogu "may return to work as of today, 9/25/2013, without any restrictions."[3]  Mooyoung accepted this new letter and Ejiogu commenced work that day.

On September 26, Dempsey met with Ejiogu to review her duties -- including the newly added HR responsibilities -- and to provide Ejiogu with updates on what had happened in her absence.  Most of the duties were identical to those Ejiogu had been required to perform before taking leave.

Ejiogu also met with Mooyoung on September 26.  Mooyoung presented Ejiogu with two documents entitled "Review of

---

[3] Ejiogu's timecard reflects that she clocked out from Grand Manor at approximately 2:09 p.m., and clocked back in at approximately 2:43 p.m.

Responsibilities of In-Service Coordinator" ("ROR") and "HR File Documents."  While the Grand Manor Personnel Handbook provides that, upon hiring, a "[d]etailed job description[] will be given out" the defendants acknowledge that no detailed job description "was [previously] provided for In-Service Coordinator."  The ROR listed duties that Ejiogu had not previously performed but which Dempsey had performed after Bosze's departure.  Ejiogu refused to sign the documents at her September 26 meeting with Moooyoung.[4]  In their meetings with Ejiogu, both Dempsey and Mooyoung accused Ejiogu of having hoarded papers in her office.

At some point on September 26, Ejiogu also met with Martin and Bradley Liebman, the co-owners of Grand Manor.[5]  According to Martin Liebman, Ejiogu was "very distraught."  The Liebmans

---

[4] As Ejiogu subsequently explained during her deposition, she pleaded with Mooyoung to "hold off" on signing the ROR until she had an opportunity to discuss some of her concerns:

> I said, Ma'am, with all due respect, I have concerns as to how to carry out my duties; you are saying I can't stay in the office.  I kept saying, Ma'am, with all due respect, please, please can we just hold off, let this be resolved when the administrator comes back.  She is like, No . . . She wanted me to sign right there.  It was now or never; you have to obey.

Specifically, Ejiogu was concerned "[a]s to how to get the job done" since the ROR said "do not stay in office," but she still "need[ed] the computer to get the work done . . . to update things in the bullet points."

[5] The Liebmans cannot recall precisely when they met with Ejiogu, but believe the meeting occurred on Friday, September 27 -- not September 26.

instructed Ejiogu to return on Monday, September 30, to speak with Wolf about whatever issues she was experiencing.

Because Ejiogu refused to sign the ROR form during her September 26 meeting, Mooyoung arranged another meeting with Ejiogu for September 27.  At Mooyoug's request, both parties brought witnesses to the September 27 meeting.

Ejiogu borrowed a cellular phone in order to try to record the September 27 meeting.  She placed it in her pocket but asserts that she didn't make a recording because she didn't know how to use the phone to do so.  At the meeting, the phone made a noise.  Mooyoung, believing that Ejiogu was attempting to record their meeting, lunged to grab the phone from her hand.[6]  Ejiogu kept the phone and Mooyoung instructed Ejiogu to "clock out and leave."

Ejiogu interpreted Mooyoung's "clock out" instruction as a termination of employment.[7]  Mooyoung contends that she simply intended for Ejiogu to leave work that Friday and return on Monday, September 30.

---

[6] Mooyoung claims that she simply asked to see the phone and reached her hand out.

[7] In her opposition to the defendants' Local Rule 56.1 statement of material facts, Ejiogu acknowledges that "[i]f it was not a discharge outright -- plaintiff being told to leave without any instruction as to when to return, with all attendant circumstances -- it was a constructive discharge."

After Ejiogu's departure from Grand Manor's premises,[8]
Mooyoung drafted a disciplinary suspension form accusing Ejiogu
of failing to follow instructions and misconduct.[9]  The
suspension form stated that Ejiogu had

> violated facility policy and failed to follow
> instructions.  When asked to meet with DNS and ADNS[10]
> for review of position (Inservice Coordinator)
> responsibilities, [Ejiogu] failed to respond and come
> to nursing office despite being called and paged
> overhead.  [Ejiogu] was noted in her office at the
> time but refused to respond.  [Ejiogu] failed to
> produce staff competencies she said was done on
> 9/26/13 as directed.  Ms. Ejiogu was also noted taping
> conversations in DNS office as witnessed by ADNS and
> DNS without permission or notification on her cell
> phone.  When Ms. Ejiogu was confronted with this
> discovery she abruptly left the office and refused to
> come back as directed by myself DNS.

The form contains a handwritten annotation directly beneath the
term "Suspension" that reads: "9/27/13 told to punch out 12:30pm
[and] return Monday when Mr. Wolf Admin would be in facility."
The form is signed by Mooyoung and an ADNS witness, but the

---

[8] According to Ejiogu, the Liebmans witnessed Ejiogu walk out of
Grand Manor.  Ejiogu argues that the Liebmans' silence and
general failure to intervene during Ejiogu's departure
"ratified" or otherwise affirmed the fact that she had been
fired by Mooyoung.

[9] Next to the highlighted "misconduct" term is a handwritten
annotation that states: "(Insubordinations)."

[10] "DNS" is an abbreviation for Director of Nursing, while "ADNS"
is an abbreviation for Assistant Director of Nursing.

"received by" signature line is left blank.  The form was never shown to or sent to Ejiogu and the parties agree that Ejiogu was never formally suspended.

## IV.  Ejiogu Never Returned to Grand Manor.

When Ejiogu did not return to Grand Manor on Monday, September 30, Wolf attempted to contact her on her cell phone at least four times between 11:07 a.m. and 11:23 a.m.[11]  Wolf also attempted to contact Ejiogu's emergency contact number at least four times between 11:23 and 11:25 a.m.  Wolf's attempts to reach Ejiogu are reflected in Ejiogu's cell phone records, Grand Manor's phone records, and emails Wolf sent to Mooyoung that morning.  One of Wolf's emails indicates that he "left a message that Gladys Ejiogu should call Howard Wolf at her earliest opportunity."  Wolf also sent a certified letter on September 30 to Ejiogu's home address explaining that on September 30, he made several unsuccessful attempts to contact Ejiogu by phone. He wrote that it was "urgent that you contact Ms. Mooyoung as soon as possible."

---

[11] According to Wolf, a recorded message indicated that the phone number was incorrect.  Wolf also claims that he called Ejiogu on her home phone number but received a message that the number was not in service.  Ejiogu maintains that both numbers were functioning properly.

Ejiogu acknowledges that she received Wolf's letter on or about October 4, but did not respond or attempt to contact Wolf or Mooyoung thereafter.  After not hearing from Ejiogu, Wolf formally terminated Ejiogu's employment on October 4.  His letter of termination outlined his account of the September 27 interactions between Ejiogu and Mooyoung.  Specifically, Wolf noted that "[d]uring the course of your meeting with Ms. Mooyoung, certain deficiencies in your performance were noted and you were advised that it was the facility's expectation that these problems would be corrected."  Wolf's letter acknowledged that Mooyoung had instructed Ejiogu to "punch out and leave the building," but that Ejiogu had, "in turn, indicated that you would be calling me on Monday to discuss your meeting with Ms. Mooyoung."  Wolf's letter also detailed his unsuccessful attempts to contact Ejiogu on September 30, 2013.

On October 8, 2013, Ejiogu received a letter with attached forms from the New York State Department of Labor ("DOL").  The letter acknowledged that the DOL had "received information indicating that you are engaged in or seeking self employment" and listed September 30, 2013 as the effective date of claim. Ejiogu was required to complete two forms in connection with her claim.  In the "Career-Oriented Training Questionnaire," Ejiogu noted that she was presently enrolled in a course entitled

"Principles of Child Development/Learning" from 6:30 to 8:00 p.m. on Tuesdays and Thursdays, and that she was scheduled to begin 120 hours of training in "Child Development Associate Training" on October 8, 2013.  In a separate form, Ejiogu indicated that she started a child care business in September 2012, but that she had been trying to recruit children to the child care center with "little or no success at this time," and that she had "never worked on the business, because [she had been] trying to get children to enrol[l] into the daycare center."  She claimed that the business had ceased operating "when I had no child at all in the day care and when I was on FMLA."  Finally, the form stated that "[t]his business just got started in August [2013] after . . . opening in Sept. 2012 due to the fact that I was on FMLA and also the fact that I had no child enlisted in the day care."

The statements in Ejiogu's completed DOL forms were made under penalty of perjury "for the purpose of obtaining unemployment insurance benefits."  During her deposition, Ejiogu acknowledged that she was able to operate her daycare business following her return from FMLA leave because she had completed all of her licenses and certifications.

**V.    Procedural History**

In a complaint filed on January 23, 2015, and amended on October 5, 2015, Ejiogu principally alleges that her employment was unlawfully terminated in retaliation for her decision to take FMLA leave.  She asserts that the defendants interfered with, and retaliated against her for exercising, her rights under the FMLA, 29 U.S.C. §§ 2601 et seq.  Ejiogu also brings a claim of retaliation under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, as well as under NYCHRL, N.Y.C. Admin. Code § 8-107.  The defendants filed their motion for summary judgment on May 2, 2016.  The motion became fully submitted on July 25. This case was reassigned to this Court on November 22.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cty. Of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual dispute. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 456

(1992); Gemmink v. Jay Peak Inc., 807 F.3d 46, 48 (2d Cir. 2015).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in [Rule 56], must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016). The court must draw all inferences and all ambiguities in a light most favorable to the nonmoving party. Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

I.    **FMLA Causes of Action**

The FMLA entitles eligible employees with qualifying reasons to twelve workweeks of unpaid leave during any twelve-month period.  29 U.S.C. § 2612(a)(1).  Qualifying reasons include "a serious health condition that makes the employee unable to perform the functions of the position of such employee" or to care for a parent of an employee if the parent has a serious health condition.  Id. § 2612(a)(1)(C), (D).

Section 2615 of the FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under [the FMLA]."  Id. § 2615(a)(1).  This section creates a private right of action for an employee to seek both equitable relief and money damages against an employer that interferes with, restrains, or denies the exercise of FMLA rights.  Sista, 445 F.3d at 174.  Ejiogu asserts claims of both interference and retaliation under § 2615(a)(1).

A.    **FMLA Interference**

"To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA."  Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016).  Interfering with the exercise of an employee's rights

15

includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Potenza v. City of N.Y., 365 F.3d 165, 167 (2d Cir. 2004) (per curiam) (citing 29 C.F.R. § 825.220(b)).  Interference also includes "discharging or in any other way discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the [FMLA]," 29 C.F.R. § 825.220(a)(2), and "induc[ing] employees to waive[] their prospective rights under FMLA." Id. § 825.220(d).

In order to prevail on an FMLA interference claim, a plaintiff must establish:

> (1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that she was entitled to take leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA.

Coutard v. Mun. Credit Union, 848 F.3d 102, 109 (2d Cir. 2017) (citation omitted).

Ejiogu contends that the defendants interfered with her rights under the FMLA when: (1) Grand Manor failed to notify her of her right to take up to twelve weeks of unpaid leave to care for her ailing mother; (2) Mooyoung refused to accept Ejiogu's first "Return to Work" letter; and (3) Grand Manor did not

restore her to the same or an "equivalent position" upon her return to Grand Manor.

There is no dispute as to the first three elements of the interference claims.  Ejiogu had worked more than 1,250 hours in the twelve months preceding her request for leave to care for her mother.  See 29 U.S.C. § 2611(2)(A)(i)-(ii).  Each of the defendants is an "employer" to which and to whom the FMLA applied throughout the duration of Ejiogu's employment.  See id. § 2611(4).[12]  The health condition of Ejiogu's mother and her own Graves' disease are "serious" health conditions that involve "continuing treatment by a health care provider."  See id. § 2612(a)(1)(D); § 2611(11)(B).  The parties dispute whether Ejiogu gave adequate notice and/or whether she was denied FMLA benefits to which she was entitled.

### 1.   Failure to Notify Ejiogu of her Right to Take Three Months of FMLA Leave

The FMLA imposes notice requirements on both employees and employers regarding requests for leave.  When leave is

---

[12] The FMLA defines "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i).  The term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  Id. § 2611(4)(A)(ii)(I).

unforeseeable, an employee must provide notice to her employer "as soon as practicable."  29 C.F.R. § 825.303(a).  "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA."  Id. § 825.303(b).  The employee must simply "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  Id. § 825.303(b) (emphasis added); Coutard, 848 F.3d at 111.

The employer, in turn, is "expected to obtain any additional required information through informal means."  29 C.F.R. § 825.303(b).  An employee has "an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying."  Id.  In sum,

> [T]he obligation of an employee to give notice of his need for FMLA leave is not the obligation . . . to provide the employer with all of the necessary details to permit a definitive determination of the FMLA's applicability at or before the time of the request. Rather, in the absence of a request for additional information, an employee has provided sufficient notice to his employer if that notice indicates reasonably that the FMLA may apply.

Coutard, 848 F.3d at 111.  In other words, "it is the employer's responsibility, not the employee's, to determine whether a leave request is likely to be covered by the [FMLA]."  Id. at 112 (citation omitted).

18

Once an employee requests FMLA leave, or once "the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason," the employer must "notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). "Failure to follow the notice requirements . . . may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." Id. § 825.300(e). Those rights include the opportunity to take twelve weeks of unpaid leave. 29 U.S.C. § 2612(a)(1).

Ejiogu informed Mooyoung that her mother was "very ill" and requested an opportunity to visit her in Nigeria. This statement was sufficient to trigger Grand Manor's notice obligations. It is undisputed that the defendants did not inform Ejiogu of her right to take twelve weeks of unpaid FMLA leave in connection with her mother's illness. Accordingly, the defendants' motion for summary judgment on this interference claim is denied.

The defendants appear to argue that this interference claim should be dismissed because Ejiogu did not request FMLA leave by name from Grand Manor's HR department or provide a certification of her mother's illness. Grand Manor's Personnel Handbook requires that an employee seeking leave "complete the

19

appropriate family/medical leave forms," which are available from the employee's "Department Head."  These forms must be completed as soon as the employee becomes aware of the need for leave.  Moreover, if an employee is requesting leave to care for a parent with a serious health condition, Grand Manor requires that the employee "provide medical certification from the health care provider."  Under the FMLA, "an employee seeking leave need not submit a medical certification <u>unless and until one is specifically requested by her employer</u>."  <u>Graziadio</u>, 817 F.3d at 426 (citing 29 C.F.R. § 825.305(a)).  "An employer must give notice of a requirement for certification each time a certification is required."  <u>Id.</u> (citing 29 C.F.R. § 825.303(a)); <u>see also id.</u> ("Even though the need for medical certification was stated in defendant's employee handbook, the regulations required defendant again to ask for certification after plaintiff told his supervisor he wanted leave." (citation omitted)).

Ejiogu followed the proper procedures in requesting leave to care for her sick mother.  First, Ejiogu was not required to request leave from an HR representative under Grand Manor's policies.  Second, neither Grand Manor's policies nor the FMLA

required Ejiogu to request FMLA leave by name.[13]  Finally,
Ejiogu's failure to supply a certification in conjunction with
her initial request for leave does not defeat her interference
claim.

The defendants further contend that Ejiogu's interference
claim should be dismissed because Grand Manor gave Ejiogu the
full twelve weeks of FMLA leave that year to address her own
health problems.  That Ejiogu ultimately received a favorable
leave arrangement due to a second, unrelated FMLA request does
not entitle the defendants to summary judgment on the claim that
the defendants interfered with her FMLA rights when her mother
was ill.[14]

_____

[13] In opposition to summary judgment, Ejiogu has submitted an
affidavit indicating that she asked for "FMLA" leave and knew
she was entitled to twelve weeks of unpaid leave.

[14] While Ejiogu's receipt of the full twelve weeks of FMLA leave
does not entitle the defendants to summary judgment on Ejiogu's
interference claim, it may affect what damages, if any, Ejiogu
is entitled to if she prevails on this claim at trial.  See 29
U.S.C. § 2617(1)(A)(i)(II) (providing that, in a case in which
wages, salary, employment benefits, or other compensation have
not been denied or lost to the employee, an employer who
interferes with an employee's rights under the FMLA shall be
liable to any eligible employee for "any actual monetary losses
sustained by the employee as a direct result of the violation,
such as the cost of providing care, up to a sum equal to 12
weeks . . . of wages or salary for the employee").  Moreover,
while the FMLA would have allowed Ejiogu to take unpaid leave to
care for her mother during her mother's illness, unfortunately
her mother died shortly after she requested leave.

21

   **2. Refusing to Accept Ejiogu's First "Return to Work" Letter**

  Ejiogu claims that Mooyoung interfered with her rights by refusing to accept her original "Return to Work" letter upon her return from FMLA leave.  An employer may, as a condition of restoration for an employee who has taken leave occasioned by the employee's own serious health condition, have "a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work . . . ."  29 U.S.C. § 2614(a)(4); 29 C.F.R. § 825.312(a).

  An employer may, in addition, require that such fitness-for-duty certifications "specifically address the employee's ability to perform the essential functions of the employee's job."  29 C.F.R. § 825.312(b).  But in order to do so,

> an employer must provide an employee with a list of
> the essential functions of the employee's job no later
> than with the designation notice[15] . . . and must
> indicate in the designation notice that the
> certification must address the employee's ability to
> perform those essential functions.

---

[15] A "designation notice" is a notice that an employer is required to provide an employee ordinarily within five business days "notify[ing] the employee whether the leave will be designated and will be counted as FMLA leave."  29 C.F.R. § 825.300(d).  An employer's obligation to provide a designation notice is triggered "[w]hen the employer has enough information to determine whether the leave is being taken for an FMLA-qualifying reason (e.g., after receiving a certification)."  Id.

Id.  Finally, an employer may "contact the employee's health care provider for purposes of clarifying and authenticating the fitness-for-duty certification," but the employer "may not delay the employee's return to work while contact with the health care provider is being made."  Id.

Grand Manor's Personnel Handbook requires employees who take leave occasioned by their own serious health condition "to provide medical certification that [they] are able to resume work, before [they] return."  Employees who fail to complete the "Return to Work" medical certification are "not permitted to resume work."

When Ejiogu returned to work on September 25 with a doctor's note indicating she was "cleared to return to work," Mooyoung required Ejiogu to obtain a letter from the doctor indicating that the return was "without restrictions."  Ejiogu promptly obtained the revised letter and, as she acknowledges, began work that same day.[16]  Thus, Grand Manor's request for clarification did not delay Ejiogu's return to work. Accordingly, Grand Manor is entitled to summary judgment on this claim.

---

[16] While Ejiogu clocked out from Grand Manor at 2:09 p.m., she returned 34 minutes later and stayed at Grand Manor until 5:08 p.m.  Ejiogu's timecard reflects that she was compensated for seven hours of work on September 25.

23

### 3.   **Interference with Ejiogu's Right to Reinstatement**

Ejiogu alleges that Mooyoung interfered with her right to reinstatement under the FMLA. Upon returning from FMLA leave, an eligible employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced" or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A)-(B). An employee "cannot be induced by the employer to accept a different position against the employee's wishes." 29 C.F.R. § 825.215(e). An "equivalent position" is one that is "virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status." Id. § 825.215(a). "It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." Id.

The right to reinstatement under the FMLA is not absolute. For example, a restored employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 2614(a)(3)(B). Moreover, "[t]he requirement that an employee be

24

restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f).

Ejiogu acknowledges that she received the same pay and financial benefits upon her return to work at Grand Manor, but she contends that the modified In-Services Coordinator position constituted a different position in violation of 29 U.S.C. § 2614(a). No reasonable juror could avoid the conclusion that Ejiogu was restored to an "equivalent position" at Grand Manor when she returned from FMLA leave. The addition of HR duties to the In-Service Coordinator position did not render Ejiogu's In-Service Coordinator position different for purposes of the FMLA. This is because a restored employee is not entitled to any right, benefit, or position other than those to which she would have been entitled had she not taken the leave. 29 U.S.C. § 2614(a)(3)(B). Here, it is undisputed that Dempsey -- the temporary In-Service Coordinator -- was required to perform these HR duties after Bosze's departure. Thus, had Ejiogu not taken FMLA leave, she too would have been required to perform these HR duties.

Moreover, the new HR duties were few in number, were substantially similar to those she had previously performed,

25

entailed substantially equivalent skill, and imposed substantially equivalent responsibility.  Of the sixteen directives in the ROR, only two concern HR duties.  One required her to file her inservice training documents for an employee in the employee's HR files annually; another required her to ensure that all new nurses completed their HR paperwork when hired.  As Ejiogu acknowledges, most of the directions Dempsey provided her upon her return to Grand Manor were the "same" as the directions she had received in the past.

Although Ejiogu argues principally that the addition of the HR duties so transformed her job that Grand Manor was in effect treating her as a new hire, she also complains of three other changes to her duties.  She contends that a "Do Not Stay in Office" directive in the ROR robbed her of a perquisite -- namely, her office.  But this directive cannot reasonably be construed as a revocation of her office.  Several of the sixteen separately listed responsibilities assume that she has an office that must be kept neat and clean, with correctly filed records.  Indeed, the very directive to which she points assumes that she has an office that she must leave on occasion to perform the full range of her duties.  It is undisputed that her job as In-Service Coordinator had always required her to spend time

outside her office making rounds and assessing the need for further training of staff.

She argues as well that a directive in the ROR -- to "[c]reate monthly inservice calendar; ensure at least 1 evening/night inservice date and 1 weekend date" -- deprived her of a "guarantee" that she never had to work on evenings or weekends.  Ejiogu has offered no evidence, however, that the responsibility to create a monthly calendar required Ejiogu herself to work one weeknight and one weekend date each month.

First, the document itself does not purport to set a work schedule for Ejiogu.  Instead, it describes the sixteen tasks she must perform.  The first six directives in the ROR required Ejiogu to ensure that inservice training of employees was both scheduled and completed.  For instance, the very first directive required her to create a yearly calendar of "inservice topics" and to identify a "topic of the month."  The second directive required her to create the monthly inservice calendar at issue here.  The fifth directive required her to review records to identify staff that had not attended "in-services" and to ensure that they completed that training by attending an "in-service class", through "self study" or by working with the "dept head."

Nor is there any evidence that Ejiogu expressed confusion about this issue at the time.  She did not voice any concerns

27

regarding this instruction during any of her January 26 and 27 meetings.  While her January 27 meeting with Mooyoung was interrupted because of the dispute over Ejiogu's attempt to record their meeting, Ejiogu already had been advised by the Grand Manor owners to meet with Wolf upon his return to work to raise any concerns about her employment.  Thus, even if she harbored an unexpressed concern that the ROR was intended to alter her work schedule, she knew she could address this issue with Wolf.  Without a more explicit statement by Grand Manor that it was requiring Ejiogu to work one night and one weekend day each month, there is no need to explore whether such an alteration in her schedule would have deprived her of a position equivalent to the one she had held.

Finally, no reasonable juror could conclude, as Ejiogu argues, that the "HR File Documents" checklist converted her to a "new hire."  This checklist was an essential aid so that she could perform the tasks assigned to her in the ninth directive in the ROR.  That ninth directive required Ejiogu to "ensure all HR paperwork is completed for all nursing new hires [and] ensure finance receives copies of documents for payroll," among other things.  The checklist itself included thirteen separate documents that new staff had to complete or produce.  The bottom of the checklist indicated as well that each of those documents

had to be provided to the finance department before an employee could receive a paycheck.  Notably, Ejiogu does not suggest that she herself was required to complete or produce the thirteen items listed on the checklist when she returned from her FMLA leave.  In sum, because Ejiogu was restored to an "equivalent position" under the FMLA, her FMLA interference claim as it relates to her right to reinstatement must be dismissed.

### B.   **FMLA Retaliation**

FMLA retaliation claims are analyzed pursuant to the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Potenza, 365 F.3d at 168.  To establish a prima facie case of FMLA retaliation, a plaintiff must show that:

> 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.

Graziadio, 817 F.3d at 429 (citation omitted).  The burden of proof at this stage is de minimis.  See Hicks, 593 F.3d at 166.  Once a prima facie showing is established, the burden shifts to the defendant to "demonstrate a legitimate, non-discriminatory reason for its actions."  Graziadio, 817 F.3d at 429.  The burden then shifts back to the plaintiff to demonstrate that the employer's reason was

pretextual or otherwise indicative of retaliatory intent.
Id.

     For purposes of an FMLA retaliation claim, an adverse
employment action is "any action by the employer that is
likely to dissuade a reasonable worker in the plaintiff's
position from exercising his legal rights."  Millea v.
Metro-North R.R. Co., 658 F.3d 154, 164 (2d Cir. 2011)
(applying Title VII retaliation standards for adverse
employment actions to FMLA retaliation claims).  An adverse
employment action is "more disruptive than a mere
inconvenience or an alteration of job responsibilities."
Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85
(2d Cir. 2015) (citation omitted).  Examples of adverse
employment actions include "termination of employment, a
demotion evidenced by a decrease in wage or salary, a less
distinguished title, a material loss of benefits,
significantly diminished material responsibilities, or
other indices unique to a particular situation."  Id.
(citation omitted).  "Only in limited circumstances does a
single, acute incident of abuse qualify as an adverse
employment action," such as when the incident
"constitute[s] an intolerable alteration of the plaintiff's
working conditions so as to substantially interfere with or

impair his ability to do his job." <u>Mathirampuzha v.</u>
<u>Potter</u>, 548 F.3d 70, 78-79 (2d Cir. 2008) (citation
omitted).

The plaintiff raises an inference of retaliatory
intent if she demonstrates that exercising her rights under
the FMLA constituted a negative factor in the defendant's
decision to terminate her employment. <u>See</u> <u>Sista</u>, 445 F.3d
at 176. The temporal proximity of events may give rise to
such an inference, but is "insufficient" by itself "to
defeat summary judgment at the pretext stage." <u>Zann Kwan</u>
<u>v. Andalex Grp. LLC</u>, 737 F.3d 834, 847 (2d Cir. 2013).
When an employer has offered evidence of a legitimate, non-
retaliatory reason for its employment action, a plaintiff
may defeat summary judgment "by demonstrating weaknesses,
implausibilities, inconsistencies, or contradictions in the
employer's proffered legitimate, nonretaliatory reasons for
its action. From such discrepancies, a reasonable juror
could conclude that the explanations were a pretext for a
prohibited reason." <u>Graziadio</u>, 817 F.3d at 430 (citation
omitted).

Ejiogu claims that her expressed displeasure upon her
return to Grand Manor with having to assume HR duties
constitutes an exercise of rights protected under the FMLA.

She asserts that she suffered three adverse employment
actions in retaliation for that expressed reluctance.
First, she claims she was assaulted when Mooyoung attempted
to grab a phone from her at the September 27 meeting.
Second, she claims she was suspended.  Finally, she claims
that her employment was wrongfully terminated.

### 1.  Assault

Ejiogu argues that Mooyoung lunged toward Ejiogu to grab
the phone Ejiogu was hiding during their meeting on September
27.  This single incident of abuse does not rise to the level of
an "intolerable alteration of the plaintiff's working conditions
so as to substantially interfere with or impair [her] ability to
do [her] job."  Mathirampuzha, 548 F.3d at 79; see id. at 73, 79
(finding no adverse employment action where the plaintiff's
supervisor "grabbed [his] arm, punched him in the shoulder and
the chest, spit in his face, and poked him in the eye").
Accordingly, this incident does not constitute an adverse
employment action for purposes of an FMLA retaliation claim.

### 2.  Suspension

It is undisputed that Mooyoung drafted a disciplinary
suspension form after her meeting with Ejiogu on September 27.
But it is also undisputed that the form was never formally

issued or shown to Ejiogu.  Thus, the drafting of the form did not constitute an adverse employment action.

### 3.   Termination

Ejiogu claims that her employment was terminated under circumstances giving rise to a retaliatory intent.  The temporal proximity between her vocal opposition to what she perceived to be a violation of her right to reinstatement and the termination of her employment is sufficient to establish the de minimis showing of a prima facie case of retaliation.

The defendants, in turn, have demonstrated a legitimate, non-discriminatory reason for terminating Ejiogu -- namely, job abandonment.  It is undisputed that the co-owners of Grand Manor instructed Ejiogu to come back on Monday, September 30 to meet with Wolf.  It is further undisputed that Ejiogu received Wolf's September 30 letter instructing her to call Mooyoung as soon as possible.  Finally, it is undisputed that Ejiogu did not return to work on Monday, September 30 or at any time thereafter, did not meet with Wolf, and did not attempt to contact Mooyoung.

Ejiogu cannot demonstrate that the defendants' proffered reason for terminating her employment was pretextual.  Even if Mooyoung's "clock out" instruction on September 27 could be reasonably construed as an attempt to terminate Ejiogu's employment, Ejiogu received repeated notices from Mooyoung's

33

superiors that Ejiogu was expected to return to work and to continue to discuss her new responsibilities.  Ejiogu's failure to return to work and to complete those discussions constituted job abandonment.

Ejiogu argues that her failure to return to Grand Manor should not be construed as an abandonment despite the messages and instructions she received from Grand Manor indicating its expectation that she would return.  She argues that the defendants could have done more to encourage her return by driving to her home, some fifteen minutes away from Grand Manor, and inviting her in person to return to work.  No employer is required to make a home visit to an employee to convince her to not abandon her employment.  Indeed, many employees would be expected to object vehemently to an uninvited visit by their employer to their home.  Accordingly, Ejiogu's retaliatory termination claim must be dismissed.

## II.  Rehabilitation Act

Ejiogu claims that Grand Manor retaliated against her in violation of the Rehabilitation Act.[17]  Section 504 of the Rehabilitation Act "prohibits programs and activities receiving

---

[17] As Ejiogu acknowledges, there is no individual liability under the Rehabilitation Act.  See Passanante v. R.Y. Mgmt. Co., Inc., 99cv9760 (DLC), 2001 WL 123858, at *4 (S.D.N.Y. Feb. 13, 2001).

federal financial assistance from excluding, denying benefits
to, or discriminating against otherwise qualified individuals
with a disability." Disabled in Action v. Bd. of Elections in
City of N.Y., 752 F.3d 189, 196 (2d Cir. 2014) (citation
omitted); see also 29 U.S.C. § 794(a) ("No otherwise qualified
individual with a disability in the United States . . . shall,
solely by reason of his or her disability, be excluded from the
participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving Federal
financial assistance . . . ."). Retaliation claims under the
Rehabilitation Act are governed by the same standards as the
Americans with Disabilities Act ("ADA") and are subject to the
McDonnell Douglas burden-shifting framework. Treglia v. Town of
Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

In order to establish a prima facie case of retaliation, a
plaintiff must show that:

> (i) [she] was engaged in protected activity; (ii) the
> alleged retaliator knew that plaintiff was involved in
> protected activity; (iii) an adverse decision or
> course of action was taken against plaintiff; and (iv)
> a causal connection exists between the protected
> activity and the adverse action.

Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148 (2d
Cir. 2002), superseded on other grounds by 42 U.S.C. $

12102(3)(a).  "A plaintiff's burden at this prima facie stage is
de minimis."  Treglia, 313 F.3d at 719.

With respect to the first element of a retaliation claim --
participation in a protected activity -- a plaintiff "need not
establish that the conduct he opposed was actually a violation
of the statute so long as he can establish that he possessed a
good faith, reasonable belief that the underlying challenged
actions of the employer violated the law."  Muller v. Costello,
187 F.3d 298, 311 (2d Cir. 1999) (citation omitted).  In
addition to challenging perceived unlawful discriminatory
practices, seeking a "reasonable accommodation" also constitutes
protected activity under the Rehabilitation Act.  Weixel, 287
F.3d at 149.  A "reasonable accommodation" is a modification "to
the work environment, or to the manner or circumstances under
which the position held or desired is customarily performed,
that enable an individual with a disability who is qualified to
perform the essential functions of that position."  29 C.F.R. §
1630.2(o)(1)(ii).  A reasonable accommodation can be achieved in
a variety of ways, and may include "[j]ob restructuring; part-
time or modified work schedules; reassignment to a vacant
position" and other similar accommodations for individuals with
disabilities.  Id. § 1630.2(o)(2).

The Second Circuit has not specifically addressed whether twelve weeks of FMLA leave may constitute a "reasonable accommodation" under the Rehabilitation Act.  With respect to a request for a finite, unpaid, non-FMLA leave of absence, however, the Second Circuit has observed that

> the idea of unpaid leave of absence as a reasonable
> accommodation presents a troublesome problem, partly
> because of the oxymoronic anomaly it harbors -- the
> idea that allowing a disabled employee to leave a job
> allows him to perform that job's functions -- but also
> because of the daunting challenge of line-drawing it
> presents.

Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 185 n.5 (2d Cir. 2006) (citation omitted).  Whether the leave is finite and whether it is reasonably likely to enable the employee to return to work are some factors that courts might take into consideration when assessing whether such leave constitutes a "reasonable accommodation."  Id. at 186 n.6.

Ejiogu appears to contend that her request for FMLA leave was also an invocation of her rights under the Rehabilitation Act since her Graves' disease is a disability.[18]  Ejiogu has not

---

[18] The contours of Ejiogu's Rehabilitation Act claim are unclear. Ejiogu devotes approximately one page to this cause of action in her opposition brief.  Moreover, Ejiogu does not perform an independent analysis for retaliation under the Rehabilitation Act.  Instead, she cross-references her FMLA retaliation analysis, even though the FMLA and the Rehabilitation Act protect different (albeit, potentially overlapping) rights.

demonstrated, however, that Graves' disease constitutes a

"disability" under the Rehabilitation Act.[19]  Nor has she offered

evidence to suggest that Grand Manor knew that her request for

FMLA leave was a request for an accommodation for this

disability.[20]  Nevertheless, assuming that seeking FMLA leave

---

[19] The Rehabilitation Act defines the term "disability" with
respect to an individual as "a physical or mental impairment
that substantially limits one or more major life activities of
such individual," "a record of such an impairment," or "being
regarded as having such an impairment."  29 U.S.C. § 705(20)(B)
(cross-referencing 42 U.S.C. § 12102(1)).  A "major life
activity" also includes the operation of a major bodily
function, such as the circulatory, endocrine, and reproductive
functions.  42 U.S.C. § 12102(2).  Ejiogu's opposition brief
conclusorily asserts that she "had a disability recognized by
the ADA/Rehabilitation Act."  She has, however, presented no
evidence that her medical condition constituted a disability, as
defined by the statute, or that either she or Grand Manor
considered it to be such.  Among other things, she has offered
no evidence that her symptoms substantially limited a major life
activity.  See 29 C.F.R. § 1630.2(j); Parada v. Banco Industrial
De Venezuela, C.A., 753 F.3d 62, 69 (2d Cir. 2014) (noting that
the determination of whether an impairment substantially limits
a major life activity involves several factors and requires a
fact-specific inquiry).  To the contrary, her "Return to Work"
letter from her doctor stated that she was able to work "without
any restrictions."

[20] According to federal regulations, an employer is not "expected
to accommodate disabilities of which it is unaware."  29 C.F.R.
pt. 1630, App.  Rather, "[e]mployers are obligated to make
reasonable accommodation only to the physical or mental
limitations resulting from the disability of an individual with
a disability that is known to the employer."  Id. (Emphasis
added).  Otherwise, "it is the responsibility of the individual
with a disability to inform the employer that an accommodation
is needed."  Id.  "When the need for an accommodation is not
obvious, an employer, before providing a reasonable

constitutes a protected activity under the Rehabilitation Act, that Ejiogu believed that she was disabled when she requested this leave, and that Grand Manor knew she was engaged in activity protected by the Rehabilitation Act, Ejiogu still cannot demonstrate that she suffered an adverse action in connection with this protected activity.

Ejiogu complains that Grand Manor terminated her employment because she took the FMLA leave to address her disability.  But, as already described, Ejiogu abandoned her job.  She returned to work, presented evidence to Grand Manor that she could perform her job without restrictions, and then abandoned her job without completing discussions with her supervisors of what her duties would be upon her return.  No reasonable juror could conclude that she was fired in retaliation for taking three months of leave.

**III. NYCHRL Retaliation Claim**

Ejiogu claims that the defendants improperly retaliated against her for exercising her right of accommodation under NYCHRL, N.Y.C. Admin. Code § 8-107.  NYCHRL makes it unlawful

---

accommodation, may require that the individual with a disability provide documentation of the need for accommodation."  Id.

for an employer to discharge or discriminate against an
individual because of a disability.  It states:

> It shall be an unlawful discriminatory practice . . .
> [f]or an employer or an employee or agent thereof,
> because of the actual or perceived . . . disability .
> . . status of any person . . . to refuse to hire or
> employ or to bar or to discharge from employment such
> person; or . . . to discriminate against such person
> in compensation or in terms, conditions or privileges
> of employment.

Id. § 8-107(1)(a).  Disability is broadly defined under the
NYCHRL as "any physical, medical, mental or psychological
impairment, or a history or record of such impairment."  Id. §
8-102(16)(a).  "Impairments" include, but are not limited to:

> [problems associated with] the neurological system;
> the musculoskeletal system; the special sense organs
> and respiratory organs, including, but not limited to,
> speech organs; the cardiovascular system; the
> reproductive system; the digestive and genito-urinary
> systems; the hemic and lymphatic systems; the
> immunological systems; the skin; and the endocrine
> system . . . .

Id. § 8-102(16)(b)(1).

The plaintiff may prevail on a retaliation claim if she can
prove that "she took an action opposing her employer's
discrimination . . . and that, as a result, the employer engaged
in conduct that was reasonably likely to deter a person from
engaging in such action."  Mihalik v. Credit Agricole Cheuvreux
N. Am., Inc., 715 F.3d 102, 112 (2d Cir. 2013); see N.Y.C.
Admin. Code, § 8-107(7) (providing, in part, that "[i]t shall be

an unlawful discriminatory practice for any person engaged in
any activity to which this chapter applies to retaliate or
discriminate in any manner against any person because such
person has . . . opposed any practice forbidden under this
chapter").

To make out an unlawful retaliation claim under the NYCHRL,
a plaintiff must show:

> (1) he or she engaged in a protected activity as that
> term is defined under the NYCHRL, (2) his or her
> employer was aware that he or she participated in such
> activity, (3) his or her employer engaged in conduct
> which was reasonably likely to deter a person from
> engaging in that protected activity, and (4) there is
> a causal connection between the protected activity and
> the alleged retaliatory conduct.

Brightman v. Prison Health Serv., Inc., 970 N.Y.S.2d 789, 791
(App. Div. 2013).  Once the plaintiff has met this initial
burden, the burden shifts to the defendant to present
legitimate, independent, and nondiscriminatory reasons to
support its actions.  Id.  If the defendant meets this burden,
the plaintiff must show that the reasons put forth by the
defendant were merely a pretext.  Id.  In sum, to establish
their entitlement to summary judgment, the defendants must
"demonstrate that the plaintiff cannot make out a prima facie
case of retaliation or, having offered legitimate,
nonretaliatory reasons for the challenged actions, that there

41

exists no triable issues of fact as to whether the defendant's explanations were pretextual."  Id. at 791-92.

NYCHRL claims must be analyzed "separately and independently from any federal and state law claims."  Mihalik, 715 F.3d at 109.  Its provisions must be construed "broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible."  Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 75 (2d Cir. 2015) (citation omitted).  Thus, "even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards."  Velazco v. Columbus Citizens Found., 778 F.3d 409, 411 (2d Cir. 2015) (citation omitted).

In this case, Ejiogu's retaliation claim founders at the first step, as she has not identified any instance in which she engaged in protected activity under the NYCHRL.  Ejiogu once again attempts to equate the invocation of her rights under the FMLA with the assertion of her rights under the NYCHRL.[21]  Nor, having abandoned her job, has she shown that she experienced any adverse employment action because of an invocation of NYCHRL-

---

[21] Again, the contours of Ejiogu's NYCHRL retaliation claim are unclear, as Ejiogu devotes only a single paragraph to this claim in her opposition brief and does not identify the "protected activity" in which she was allegedly engaged.

42

protected rights.  Accordingly, for many of the reasons discussed in connection with her Rehabilitation Act retaliation claim, Ejiogu's NYCHRL retaliation claim must be dismissed as well.

### CONCLUSION

The defendants' motion for summary judgment on the FMLA interference claims is granted except for the following claim: that the defendants failed to notify Ejiogu of her right to take twelve weeks of FMLA leave in connection with her request to take leave to care for her ill mother in Nigeria.  The motion for summary judgment on the retaliation claims brought under the FMLA, Rehabilitation Act and NYCHRL is granted.

Dated:    New York, New York
          March 29, 2017

_____
          DENISE COTE
United States District Judge

43